We have five cases on the calendar this morning, two cases from the Patent Office that are being argued together, a Veterans' Appeal, a patent case from the District Court, and a Government Employee Appeal. Our first cases are Illumina Cambridge Ltd. v. Intelligent Bio-Systems, 2015-11-23-12-43. Mr. Zimmerman. Good morning, Your Honors. May it please the Court. The Board erred in its obvious analyses in both cases by focusing on the disulfide linkage limitation in isolation, and it's the disulfide that connects the label to the base. And this error is particularly apparent with respect to the issue of motivation to combine. Well, the disulfide linkage was what was added to the claims, right? It was. The original claim six had a disulfide linkage in a group of other ones for the cleavable linker. In the amendments, they narrowed it to just the disulfide out of that group and picked a particular connection point for the three-prime protecting group. Now, in making that change, the original rejection by the Board was one of anticipation. And the rejection that was sustained was an obviousness rejection. So they need to come up with a reason to use a disulfide linkage for the cleavable linker in combination with a three-prime protecting group where both are cleavable under identical conditions. And if you parse the Board's opinions carefully, they say Rabbani teaches a disulfide linkage to attach a label to a base. Church teaches a disulfide linkage to attach a label to a base. Nobody disagrees with the teachings of those two references. What the Board doesn't then do is give you any reason to use that linker in combination with a three-prime protecting group and to make them cleavable under identical conditions. And importantly, the Church method didn't have three-prime protected nucleotides. So there was no reason to combine the two from Church. The Rabbani reference teaches a three-prime protecting group. It separately teaches a disulfide linkage connecting the label to the base. But it doesn't give you any reason to put those two together. In fact, none of the nucleotides in Rabbani, despite disclosing each piece, combine those two. And the Board's opinion is bereft of any reason to actually put them together. And then when you look at what one of Skill and the Art would have known, there was actually a reason not to combine them. These nucleotides have one use, and that's sequencing by synthesis. And the record was clear. Well, that's the point, isn't it? There are a small number of procedures and references, and so putting a couple of them together isn't so non-obvious. But that's the problem here. The Board never said there's a small number of references. The Board never said it's a limited universe. The Board, with the direction of hindsight, said... In other words, you're picking on the language and the reasoning rather than really the basics of the two references. No. There was no reason to pick the disulfide linkage in the first instance from the myriad of other linkages that were available. Myriad is another case. The only reason we're focused on the disulfide linkage is because that's what was added by amendment. And if you look at the record, there are three facts that are fundamental. The first one is you need to cleave the three-prime protecting group with greater than 90% efficiency. 90% is insufficient, and that fact was undisputed. It comes from Rabbani, but IBS's expert, Dr. Brand-Shout, admitted, I agree that a person of skill in the art would want greater than 90% efficiency for cleaving the three-prime protecting group. That's JA3013. On the lips, you're not claimed in your claim. The claims have no explicit reference for the 90% figure, right? The claims do not contain an efficiency requirement. But when you look at a reason to combine the prior art, you're looking at essentially, and although the board doesn't say it, we have to assume it's the Chen and the Ju reference, both of which teach three-prime protected nucleotides and SBS processes. Both of those references make clear that you need quantitative, and IBS's expert agreed, 100% removal of the three-prime protecting group. And so you wouldn't modify those references in a way that's going to make them worse. The only proffered motivation from IBS for modifying the prior art is to improve the processes of Ju and Chen, both of which require efficiency. So efficiency is part of the motivation for modifying the prior art, even though there isn't an efficiency element to the claim. You wouldn't want to modify the prior art in a way that made the existing art less efficient, or that didn't work for its intended purpose of SBS. What about on pages JA40 through 41? Here the board has a section titled, reason to use a disulfide bond on nucleotides, and says things such as Rabini would have given a skilled worker a reason to have used a cleavable linker with a disulfide bond to ensure that the labeling moieties on the nucleotides will not interfere. Why isn't that sufficient? And I assume you're looking at the 128 case, which is the first appeal? Yes. Okay. On pages 40 and 41, if you look at what the board is doing, they're giving you a reason to use a disulfide linkage. That comes straight out of Rabini and straight out of Church. What they don't give you is any reason to use it in combination with a three-prime protected nucleotide, where you make the disulfide linkage and the three-prime group cleavable under identical conditions, which is what you would get if you combined Rabini or Church with Ju and Chen from the institution decision. So they give you a reason to use a disulfide linker in isolation, but not to combine it where you're going to cleave both groups under identical conditions. But CN gets you, I take it, to using the label cleavage and using the cleavage of the three-prime protecting group simultaneously, which in effect means under the same conditions. Yes. All right. So the only thing that's different between CN and the patent is the use of the disulfide bond, right? Yes. And that with respect to the cleaving the linker to the label. Yes, Your Honor. Right. And so you have references that teach a disulfide bond in different sequencing schemes that don't use a three-prime protecting group. And the question is, why would you use a disulfide linker in Chen? And Chen teaches that you're sequencing nucleotides from 25 to 300 units in length. You need an efficiency to be able to do that kind of sequencing. Chen expressly teaches it. And Chen teaches that you need quantitative removal of the three-prime protecting group. Now, let me ask you a question that relates to Vermas, the Vermas experiment. Yes. That took place, I gather, long after the patent was, the initial patent was issued, right? Vermas, I think, he doesn't say exactly when he did the experiment, but he said that he was hired in 2006. So presumably, he did the experiment after that. I don't remember the exact date, but it was prior to institution of the IPR proceeding. Right. But the patent, the initial patent issued well before that. Yes. All right. And he uses a specific cleavage agent, I think Tris-hydroxymethylprosteine. Yes. Which, so far as I can tell, wasn't alluded to anywhere in the patent. The patent doesn't seem to identify the cleavage agent, right? The patent talks about using reductive cleavage. Right. But that's just a very general... Exactly. And it does identify DDT as one potential cleavage agent. Right. But that was all over the prior art. Yes. Right. So there's nothing there. Right. So my problem is that you're identifying Vermas as having achieved this close to 100% efficiency, but with a cleavage agent that isn't in the patent. So where in the patent is there anything that suggests something, some increased efficiency above what the prior art had achieved, or a cleavage agent that would have achieved that? The patent doesn't teach you an expectation of better cleavage. Right. What the patent tells you is pick disulfide. And once you pick disulfide as your linker, you can have the conditions that give you the cleavage with the 3' protecting group. That's not disputed. That picking them to cleave under identical conditions would have been within the skill of the art. The problem is there's nothing that tells you to pick disulfide in the first instance. And as for your difference in solvents, if you look at JA3021, paragraph 53, it's Dr. Brand Schaud, IBS's expert. He says that you should be able to get efficient cleavage with DTT, which is what's disclosed in the prior art, and so the choice of solvent shouldn't make a difference. And IBS never challenged before the board the choice of solvent. There's no argument from any expert that the choice of solvent should make a difference. And what Illumina was able to show with their unexpected results is that in 150 cycles, you get a .43% error, which is far better than had been achieved in the art. But I would like to go back to the efficiency argument for one moment. It was undisputed that 90% was insufficient for cleaving the 3' protecting group. Dr. Romsberg, Illumina's expert, testified that you wouldn't expect the 3' group to cleave with any better efficiency than the disulfide. That testimony was unchallenged. IBS's expert never said you would expect to get better 3' cleavage you would expect to cleave them at different rates. And so once you have those two unchallenged prongs, and then the efficiency of the disulfide linkage, which was 86 or 87% based on Ruby or Herman, and then Herman does additional work where he gets about half, you just have wild variability with disulfide. And the Regas articles say there was variability. We didn't pursue disulfide linkages rigorously. So there was no reason to pick this linker that gave you variable cleavage and unpredictable results, pair it with a 3' group, and cleave them under identical conditions in a serial scheme where the efficiency of each round builds on the next one. It simply would have made Ju or Chen less efficient than they already were. And the board doesn't give you any reason to put those together. And you allude to this in your brief, but the focus of the disulfide, of course, is on the linking with the label, not the linking with the 3'03 protecting group. The patent doesn't identify any bond that is used there, as I understand it, correct? Any bond for the 3' group? It gives you a number of choices, but it doesn't pick out one in particular and say... The choices were just from, what is it, Green and Woost? Green and Woost, and then a number of them are in... It's basically all over the priorities, your choices. There wasn't anything that the patent came up with and said this is the bond to use and this is novel. In terms of the pairing with the disulfide, no. No, not the disulfide. I'm talking about the 3'OH group linking. There are particular 3' groups that are the subject of other Illumina patents, but not in this patent, the 026 or the 346. Going back to the efficiency of the disulfide, you said that the disulfide doesn't have to leave with a particular efficiency. The problem is, on this record, it's undisputed that you need at least 90%, and that 90% for the 3' group is probably insufficient. 90% for the 3' group isn't driven by the percent... I don't think, unless you... You may argue to the contrary, but I'd be interested in hearing what the argument is. My understanding was that that's not driven by the percentage of cleavage of the disulfide bond to the label. Am I wrong about that? Here's the issue on that. They are directly related in this appeal. If you look at Joint Appendix 3701 through 05, paragraphs 52, 55, 58, and 60, it's Dr. Romsberg, who is Illumina's expert. He said that the person of skill in the art wouldn't have expected the 3' group to cleave with any greater efficiency than the disulfide linker attaching the label to the base in view of Ruby, Herman, Short, Rabbani. IBS never challenged that. So you do have a direct link between the efficiency of disulfide cleavage and the efficiency of the 3' protecting group cleavage in this appeal. Why would that be as a matter of chemistry? That strikes me as peculiar. The disulfide may be a much stronger bond than what you would use for the other bond. Assuming it's not also a disulfide bond, why would it be necessarily equivalent? His testimony was that you wouldn't expect the 3' group to cleave any better. Why is that true as a matter of chemistry? It would seem to me that if you have a weaker bond, it doesn't take as strong a cleavage agent to produce a higher rate of cleavage. It's not addressed in the record. The answer was, apparently the positioning of the 3' group makes it such that you would expect the disulfide to be the limiting step. But that statement is not in the record. What is in the record is you wouldn't expect the 3' group to cleave with any better efficiency than the disulfide linker, and it's unchallenged. IBS's expert never said you could cleave the disulfide linkage at a lower rate and the 3' group at a higher rate. You gave us a citation to the appendix from Dr. Romsberg a moment ago. Could you repeat that? It's 3701-05 and the paragraph numbers are 52, 55, 58, and 60. This is from the 1123 appeal. I have it if you want it from the 12. If you've got the other one, I can give it to you. It's 3701. 3701. Thank you. And then the next piece is the board said even if efficiency mattered you could increase the efficiency of a disulfide linkage. That is unsupported by substantial evidence on this record. What about the expert testimony? The expert testimony is simply a statement from Dr. Brandschaud. It's Joint Appendix 3016, paragraph 37. It's a naked statement. The only support for it is Ruby and Herman which he relies on. The Ruby reference, the board said it teaches you all of these things and that could get you increased cleavage but Ruby actually did the experiments. Ruby changed the concentration and the cleavage agent and the best Ruby did was 86% after 100 minutes. There's nothing in the record to suggest you could do better than that. Mr. Zimmerman, you're into your rebuttal time. I thank you. Thank you, Your Honor. Mr. Barron. May it please the court, my name is Rob Barron. I represent Intelligent Biosystems. Judge Lurie, I want to turn to something you noted at the beginning of this and I think it's exactly right that it's important to understand the context which is that the nucleotide as originally claimed was found to be in the art and taught and something that a person of skill in the art would know. The nucleotide that would have the label connected by a cleavable linker to the base and a protecting group protecting the 3' hydroxyl to be used among other things in an SBS process. No. So they react to that by saying, okay, we're going to cancel our claims and we're going to instead add the disulfide. So on the one hand, to have some scrutiny of the disulfide makes sense in that perspective. You're a person of skill in the art. You see what Ju and Chen had taught and you want to build one of these nucleotides and you would look to this ubiquitous art that points to disulfide and I think that's where the board was found. The art was very substantial in that. And obviously, as you said, Judge Stoll, that they actually had a headache identifying their motivation based on Rabbani. And Rabbani's interesting because he says in the passage that identifies the disulfide linker he cites to two things. One, he cites to Pierce, which is a catalogue which lists, and that's in the record, and that catalogue lists, and I can get you that site, it's at 2970 and 1795, the actual Pierce site. It's a catalogue where it lists a linker, a disulfide linker. It says it's quantitatively cleavable with DTT. And so the point is that disulfide linkers are ubiquitous. And what Rabbani says is this is attractive and I'm motivated to use this in part because they're commercially available. And that's a kind of a motivation, a market motivation that KSR ratifies. And then in addition, he says they seem to work and he points to Ruby and the 87% for a very different experiment. And he says this is an example of someone using a disulfide linker to connect a label to a nucleotide and cleaving it. Now, I think that the crux of their argument is, and of course there's Church which shows it being incorporated in an SBS process, so the crux of their argument is they try to take the 90%, and we'll live with it for the purposes of this argument. I think that the board rightly put a lot of skepticism on the 90% for many different reasons that they articulate pretty well in particularly the 346 decision. But even if you do have a 90% requirement, it's their jump to applying it to the linker because the 90% is for the cleavage of the 3'OH. So what their theory is, I mean, there's all this art that says, okay, the nucleotide's done. A person's skill in the art would look at Zhu and Chen. Zhu and Chen say, hey, I recommend you look into chemical cleavers. All they need to be is easy to cleave. Chen says, which he referenced, they need to be non-acidically cleaved, 2 to 20 atoms. And he says, I encourage you to look at other things. So disulfide fits right within that. And so there's all these examples of being used successfully including in SBS. Their point is, a person of skill in the art, because of the 3'OH cleaving efficiency requiring 90%, would use that as a litmus test for a disulfide linker when they would look at the reported efficiencies of Ruby and Herman. And I think that's incorrect. Their theory is incorrect in a couple of ways, and the board noted them. First, as you said, Judge Stolich, in your discussion, there's no evidence that a person of skill in the art would look at those numbers and think that they're written in stone. And I disagree respectfully with Mr. Zimmerman. The board actually found that it was Roseburg who was unsupported, correctly so, on the issue of Ruby. They found that Dr. Branschow was supported, and that was at 46 of the decision. And that's because of Ruby. They said, well look, a couple things here. Dr. Branschow, that's the IBS expert, made it clear and the board picked up on this and held this that those references aren't doing SPS. So as a first instance, they're not motivated to keep on experimenting until they get to 90, some magical 90. And you're right, Judge. 90 is not in that, and I think we need to remember that. Not only is it not in the claim, it's not in the specification, which is important when it's a motion to amend. So a person of skill in the art wouldn't look at Ruby and Herman, which is looking at elution percentages of connecting something to a column and seeing how much drops out. And Ruby, in fact, says that the percentages I'm reporting are not dependent only on cleaving the disulfide linker. There are other things in what I'm doing that could affect that negatively. So they would look at that and they would say, A, I could get better, and B, Ruby teaches by optimizing conditions such as pH, such as temperature, the concentration of the cleaving agent, elongation of the linker itself, which worked in Herman, that you could optimize. How do you respond to Mr. Zimmerman's argument that the best he did was 86%, even after modifying all of those things, and that your expert's testimony at page JA3016 isn't supported? Well, I think it is supported. I think the board found it was supported. I think that he said, based on the fact that Dr. Ruby and his team was not doing SPS, number one, they didn't have to keep on experimenting to hit 90. That's number one. Number two, there's no evidence in Ruby, if you look at it, that 86 is a limit. He just reports it. He says, he actually at one point says, we didn't get a chance to try two millimolars of concentration. It was working for its purpose, which was to elute an RNA strand off an infinity column, not SPS. And so it worked for its purpose. What the board said was, Dr. Mosberg, which just said, I don't think he can get any higher than that, he didn't have anything else other than his opinion to back him up. That's what the board found. Going to Dr. Rosberg, another key point I think here is that basically what they're saying is there's no evidence that a poser would look to the disulfide linker and say, I'm cooked, I can't use that for this nucleotide because I have two things that reported under 90, even though it's working, because I need 90% for the 3'-OH. And Mr. Zimmerman talked about how Dr. Rosberg had uncontradicted testimony about how you wouldn't expect that a person would think a protecting group could be cleaved faster than the disulfide linker. And you talked, Judge Price, about the citation. I think it's important to look at those citations, and I'm sure this Court has, to be very clear Dr. Rosberg does not say that. Dr. Rosberg was a paid expert and he could have said, as an expert with a lot of experience in the field, it's my feeling, and others would also believe that under these conditions there would be no protecting group that could be cleaved any faster. What he does is he goes through each of the references, Ruby, Rabbani, Church, and he says, I've looked at Church, Church does not report a 3'-OH protecting group and a disulfide linker cleavable under identical conditions wherein there's evidence that the protecting group could be cleaved under greater efficiency than the disulfide linker. It's so carefully crafted in those paragraphs that it's clear that all he's really testifying to is those references do not provide anticipation. But he certainly had the opportunity to make that testimony. He did not. So I think that what you see the Board doing is on this, what I'll call the proxy point, that the 90%, if you look at something, the percentage that you look at for the disulfide linker can be proxied over and ported over and be a good proxy for what would happen with the protecting group. I think the Board said there's no evidence on this. And the only way we can figure out that they would be the same, to your point, Judge, is if they were the same material. And they're not. The claims don't require that. And I also want to, in talking about the claims and the claim requiring a 3-prime OH protecting group and a disulfide linker protectable under cleavable linker under identical conditions, the Board construed that to the point where they said it's not required that the linkage for the protecting group and the linker be the same, be disulfide. So just the act of construction is, Mr. Zimmerman said the Board improperly focused on the disulfide. I don't think that's right. I think if you read the Board, they framed the issues properly, they identified all the limitations, and in fact they even construed the key phrase with the 3-prime OH protecting group and the disulfide linker cleavable disulfide linker where the two are cleavable under identical conditions for the one patent or cleavable under the same chemical conditions for the other. So they construed it. So they're obviously paying attention to it as a whole. And actually, interestingly, in the secondary considerations point, one of the many reasons that the Board found that there was not evidence of unexpected results was they said you didn't provide evidence that it was the nucleotide that gave the result versus the disulfide linker. Versus the cleavage agent, right? They made several points. You're right, Your Honor. First, they said there's nothing on kind of a nexus argument. There's nothing on the nexus argument which was their primary observation. They said there's nothing here that would prove that it was this quote-unquote unexpected result was due to the bond as opposed to the cleaving agent because they used a different cleaving agent than had been used previously. That's exactly right. And that is totally supported by the record, the substantial evidence. But they also, towards the end, they made what I'll call an inherency or latency observation in Ray Baxter where they said and they called out Illumina for saying, look, for it to be you didn't provide any evidence that the nucleotide with all of its limitations is what created this. You just focused on the bond and therefore the disulfide linkage, this has been known. So I think that you're just talking about to the extent it was unexpected, that it was something that was an inherent property of an already known thing. I mean, the fact is since the 90s, the disulfide linker was known, was known to be ubiquitous, easy to get, known to be mildly cleavable, was shown to incorporate by the polymerization process by Church who their expert admitted was one of the greatest minds in DNA and was also shown in Rabani where there was a 3'OH. He even recognizes the 90% issue and he still goes to Ruby and a disulfide linker. So we think that they certainly recognize the limitations. Is there anything else I can help you with? Apparently not. Mr. Barron, no one loses points for not using up all your time. Thank you very much. Thank you. Mr. Zimmerman has some rebuttal time. Thank you, Your Honor. I'd just like to make three quick points. The first one is that the characterization of Dr. Romesburg's testimony in paragraphs 52, 55, 58, and 60 as carefully crafted, he looks at each reference that was before the board and says, this reference wouldn't give a person of skill in the art the expectation that you would cleave the disulfide and the 3' protecting group under identical conditions and get above 90 for the 3' group. The testimony was straightforward. If there were any ambiguity that this was carefully crafted or that a person of skill in the art would have said, no, no, no, the expectation is different, I assume their expert would have said it somewhere. The statements from Dr. Romesburg are completely unchallenged on this record. The second point goes to Judge Stoll's discussion about could you improve disulfide cleavage based on Ruby and Herman. Those are the only two references Dr. Branschow relied on. They're the only two references the board relied on. If you look at Ruby, Ruby actually did the experiments. Varied pH, varied concentration, varied the cleavage agent, and he got 86% after 100 minutes. We're talking about, if you use this for SBS, a serial scheme, that 100 minutes means to do five bases. You're talking 500 minutes. There's no expectation that you could improve this and the board didn't give us any. Then on the Herman references, the original cleavage of Herman was 87%. Two years later, they said we got virtually all of it, but there's no data in that paper. Two years after that, they provide the data and it's 50%. There's no basis for the board to say you could routinely enhance cleavage efficiency with an expectation of success. There just isn't substantial evidence to support that point. For the board to say, wildly variable cleavage gives you an expectation of success we think was erroneous. The last point is, we heard from Mr. Barron that the disulfide linkages are ubiquitous and that they were out there in the art. There isn't a single reference that suggests you put a disulfide linkage with a three prime protecting group and you cleave them under identical conditions. If you read both boards' opinions, there is not a statement anywhere in there that says you put them together because. At the end of the day, you're left with what is the motivation to combine these? Although we can all try to come up with one, there isn't one in the board's opinion and therefore it's insufficient. Thank you.